UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YELENA RUGOVAC,<br><br>          Plaintiff,<br><br>     v.<br><br>COVENANT HOUSE d/b/a COVENANT<br>HOUSE NEW YORK,<br><br>          Defendant. | ECF CASE<br><br>No.:_____<br><br>COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1.     Yelena Rugovac ("Ms. Rugovac"), through her counsel, files this Complaint against her former employer Covenant House d/b/a Covenant House New York ("CHNY"), asserting several claims: disability and age-based discrimination, retaliation and wrongful termination under the Americans With Disabilities Act ("ADA"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"), and the Age Discrimination in Employment Act 29 U.S.C. § 623(1) (ADEA).

2.     Ms. Rugovac alleges that CHNY willfully and knowingly violated these anti-discrimination statutes by creating a hostile work environment, which caused her to suffer a seizure at work, a possible heart attack, and to become partially deaf, and by retaliating against her because of her age and disability through baseless disciplinary actions, including demotion and constructive discharge.

3.     Ms. Rugovac also alleges that CHNY willfully and maliciously violated the Family and Medical Leave Act of 1993, 29 USC §§ 2601, *et seq*. (the "FMLA") by retaliating against her for having taken job-protected leave and interfering with her right to take such leave, as set forth more fully below.

-1-

JURISDICTION, VENUE AND EXHAUSTING ADMINISTRATIVE REMEDIES

4.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims under 28 U.S.C. § 1367.

5.      Venue is proper in this District under 28 U.S.C. §§1391(b)(1), 1391(b)(2): a substantial part of the events giving rise to the action occurred in this District; and Defendant is a resident of this District.

6.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

7.      On approximately April 30, 2019, Ms. Rugovac filed a charge with the U.S. Equal Employment Opportunity Commission and the EEOC Notice of Right to Sue was received on November 6, 2019.

THE PARTIES

8.      Plaintiff Ms. Rugovac was and is, at all relevant times, an adult individual residing in Brooklyn, New York.

9.      Defendant CHNY was and is, at all relevant times, a domestic not-for-profit corporation, organized and existing under the laws of the State of New York with its principal place of business at 460 West 41 Street, New York, NY 10036.

STATEMENT OF FACTS

10.      CHNY is an organization that provides residential services to homeless, runaway, and exploited youth, ages 16 to 24 years old. Upon information and belief, CHNY has over 30 locations in the US, Mexico and other Latin American countries, and has over 100 employees.

11.     Ms. Rugovac worked at CHNY from approximately 1997 and until she was constructively discharged on November 13, 2018[1].

12.     In 1997, Ms. Rugovac began working at CHNY as a House Keeper, but she steadily rose up through the ranks becoming a Bookkeeper, then Accountant, then a Grant Accountant, and finally a Grant Manager in the Finance Department (the "Department") on October 10, 2010.

13.     As a Grant Manager, Ms. Rugovac's duties included, but were not limited to, overseeing compliance with grant regulations, preparing grant proposals and paperwork, overseeing and preparing progress reports, and documenting payments and expenditures.

14.     At the time of wrongful termination, Ms. Rugovac's annual salary was approximately $63,349.52. She also had medical insurance and other benefits through her employment, and was only approximately two and a half years away from her retirement benefits.

15.     While working at CHNY, Ms. Rugovac received positive reviews rating her "Met Expectations" or "Exceeded Expectations." In June 2018, Ms. Rugovac also got the Staff Award for 20 years of service from CHNY.

16.     In or about 2012, a criminal investigation was started by a New York State District Attorney's Office into allegations of embezzlement and theft of money from the Department's Special and Company Accounts by one of CHNY's Payroll Managers, Laura Shaw. Upon information and belief, this investigation lasted for over three years until Ms. Shaw was found guilty and sentenced to jail in approximately the summer or the fall of 2015.

17.     During the time of the underlying embezzlement and later investigation, Jo Reyes, Director of Finance, at the time, was in charge of overlooking the functions and compliance of the

---

[1] All date ranges and times in the Complaint are based on Plaintiff's memory and good faith, best estimates

Department. Since the theft of funds went unnoticed for many years under Reyes's supervision, she was put under a lot of pressure and scrutiny during the investigation.

18.     As pressure mounted in approximately 2014 and 2015, Reyes developed paranoia and began to baselessly harass and accuse Ms. Rugovac of theft at work, despite the fact that she was neither the employee under investigation nor responsible for the accounts from which the theft occurred.

19.     Reyes would march up to Ms. Rugovac almost daily, and in front of other employees and coworkers yell at her: "did you take the money?!," "you stole the money, didn't you!?' and "I know it's you, you thief."

20.     Reyes's behavior and defamatory accusations caused Ms. Rugovac extreme stress, humiliation, embarrassment, severe anxiety, depression, emotional and physical pain, causing her physical and mental health to begin to deteriorate, especially after she had loyally worked for CHNY for over 21 years.

21.     On or about March 21, 2016 at approximately 9:00 a.m., due to the harassment, hostile work environment and severe stress, Ms. Rugovac suffered a seizure and a possible heart attack at work.

22.     The seizure and the possible heart attack were accompanied by severe shaking, hysterical crying, loss of breath, fainting, and a sudden hearing loss in both of her ears.

23.     CHNY's callous and reckless harassment and regular baseless accusations of having committed crimes at work, put Ms. Rugovac's health and life in danger and on March 21, 2016, resulted in her developing a disability, partial deafness, which still ails Ms. Rugovac to this date. To add insult to injury, it is exactly for this disability, that CHNY itself caused, that it later retaliated and eventually wrongfully terminated her.

24.     After the March 21, 2016 incident, Ms. Rugovac saw several doctors, including but not limited to, a neurologist and a cardiologist, and was diagnosed with a seizure, possible heart attack, nervous breakdown, and severe depression and recommended to change her work environment.

25.     Ms. Rugovac had to take approximately three months off of work under Family and Medical Leave Act ("FMLA") for her numerous serious health conditions stemming from the March 21, 2016 incident.

26.     During the time Ms. Rugovac was on FMLA leave, Reyes continued to repeatedly contact her at home to harass her, asking her to return to work immediately, all at a time when Reyes should not have been having *any* contact with Ms. Rugovac because of her approved leave status.

27.     While during the FMLA leave, some of Ms. Rugovac's symptoms healed, however she was still left partially deaf after the March 21, 2016 incident.

28.     On or about June 13, 2016, when Ms. Rugovac returned to work after her FMLA leave, CHNY began to harass and retaliate against her for the partial deafness, a disability that CHNY itself had caused due to the extreme and unlawful work conditions it had put her through.

29.     CHNY's management started to pick on Ms. Rugovac because she was partially deaf by regularly making ill spirited discriminatory comments to her. For instance, Reyes regularly singled out Ms. Rugovac in front of other employees and told her that "it's a problem that [she] can't hear" and that she is "deaf," warning her that her job was in jeopardy if she "doesn't start hearing within two weeks," and telling her that "[i]f you can't hear, we don't want you."

30.     To harass and to bring attention to Mr. Rugovac's disability, Reyes often sneaked up on her from behind while she was working at her desk, and without any warning began yelling at her "I have been here for 10 minutes, but you cannot hear me!"

31.     Ms. Rugovac told Reyes on multiple occasions that she has partial hearing and that there was no need to assault her with loud yelling and scare her in the process, instead Reyes could knock when she came to see her, or call her name in a normal voice so she could turn around, or email her that she wanted to speak and Ms. Rugovac would be expecting her.

32.     However, Reyes refused to change her behavior, continued to startle and harass Ms. Rugovac with loud yelling from behind and continually insisted that Ms. Rugovac must get a hearing aid immediately and also stated that this condition was connected with her age.

33.     Ms. Rugovac explained to Reyes that she was undergoing a treatment after the March 21, 2016 incident and that her doctors advised her against a hearing aid until other issues are addressed and her stress is lowered, after which time an evaluation can be made if a hearing aid is necessary. Ms. Rugovac also advised Reyes that her doctor diagnosed her deafness not to be age-related and instead was caused by severe stress at work, so should get better as stress subsides.

34.     Reyes disregarded this medical advice and continued to bully Ms. Rugovac into getting a hearing aid.

35.     One day when Ms. Rugovac arrived to work, she saw a big yellow envelope on her desk left by Reyes, with a handwritten note to her, reading: "You can check this out. Throw it out if you're not interested. Thanks. Jo."

36.     The envelope contained several advertisings for people with hearing disabilities. One such advertising was for a hearing aids, one for a new hearing aid trial that was recruiting

people with hearing loss, and another was titled "Is it hearing loss… or just EARWAX?", offering an otoscopic assessment.

37.     On or about the same day when Reyes placed the envelope on Ms. Rugovac's table, Reyes also told her "I can't talk to you, you must order one of [the hearing aids]."

38.     Ms. Rugovac was extremely embarrassed and distressed by Reyes's intrusiveness and insensitivity, as well as by her continual harassment of her because of her disability.

39.     Ms. Rugovac was also forced to meet with Theodora Carter, Senior Vice President of Human Resources ("Carter" or "HR"), and Reyes, to discuss her disability on multiple occasions.

40.     At one such meeting in or about October 2016, she was told that "[w]e have a problem. You can't hear," and that "[i]f you can't hear, we don't want you."

41.     When Ms. Rugovac explained that she is able to do her job duties of a Grant Manager even with her newly accrued disability, which did not disrupt communication with others as that was mostly done through email and other writings.

42.     Furthermore, she told HR and Reyes that she had partial hearing and so that did not prevent her from communicating with her colleagues face to face either, at which point HR and Reyes accused Ms. Rugovac of lying and told her that "you don't really hear us, you are reading lips instead, and that's a problem."

43.     At the end of the meeting, Carter and Reyes told Ms. Rugovac that she "has two weeks to start hearing," and that they are placing her on a "two week probation" for her to recover.

44.     During or after another such meeting, Reyes revealed her intention to get rid of Ms. Rugovac, when she asked her when she is going to be ready to retire, pointing out that it must be

soon since she was in her late 50s at the time. Ms. Rugovac told her that she would retire in 2 to 3 years at around 59 years old when her pension benefits become available, and not before that.

45.     Furthermore, with no other identifiable aim besides retaliation and humiliation, on one occasion Reyes, in front of at least one other employee, told Ms. Rugovac that she was overweight and did not smell good.

46.     On or about August 2016, Reyes once again singled out Ms. Rugovac from the entire staff and requested that she verbally report her time in and out of work every single day, when she arrives and leaves work, despite the fact that she was allegedly a salaried, and not an hourly, employee.

47.     Since Ms. Rugovac often came to work before 9:00 a.m. and left later that others, when her supervisors were not in the office, she had to send emails confirming the time she got in and out of work every day.

48.     CHNY only established and applied this requirement to report the in and out times for Ms. Rugovac and not other salaried employees.

49.     Ms. Rugovac contacted Nancy Downing, Executive Director of CHNY, on more than one occasion, complaining to her about the ongoing and pervasive harassment at work due to her age and disability, and told her about the insulting and terrible comments made by Carter and Reyes.

50.     In response, Downing simply told Ms. Rugovac to "smoke more and worry less."

51.     On another occasion when Ms. Rugovac sought help again, Downing told her that she can file a complaint with the EEOC if harassment is getting to her. Downing, or anyone to CHNY for that matter, however, failed to investigate or address in any manner Ms. Rugovac's complaints, but instead turned a blind eye on the hostile and intolerable work environment.

52.     CHNY further harassed and retaliated against Ms. Rugovac because of her age and disability, including but not limited to, by complaining that her phone's ringtone was now turned on too loudly.  For instance, on one occasion, when Ms. Rugovac accepted a call from her 87 year old mother, she was told off that her phone call was unacceptable in the workplace and that she spoke too "loudly" to her mother, so next time this happens, she has to leave the office and go outside.

53.     Reyes and Carter's discrimination of Ms. Rugovac was so severe and pervasive that no matter what she did, including and not limited to, following their own directions, they would find a way to discipline or criticize her for it.

54.     For instance, in order to avoid harassment for being too loud on the phone, Ms. Rugovac attempted to switch to texting, if she ever needed to use her personal phone, however when she did that, she was given negative comments by Reyes and/or HR for using her phone at work.

55.     Ms. Rugovac then attempted to resolve the issue by following CHNY's directive and going outside when she needed to speak with her mother, but Reyes and Carter used this too to further retaliate and discriminate against Ms. Rugovac.

56.     Reyes and Carter asked her direct supervisor, Russel Miller, Director of Grants and Purchasing, to discipline her and write her up for allegedly being on the phone and being away from her desk for too long.

57.     Mr. Miller found these requests unfounded as not only did he not witness the alleged behaviors , but also other employees were permitted to use their personal phones inside the office without any discipline or criticism.

58.     Reyes and Carter also harassed Ms. Rugovac for taking smoking breaks, despite the fact that the Department had approximately 20 other smokers who routinely took more smoking breaks than Ms. Rugovac; none of whom were treated or disciplined like Ms. Rugovac.

59.     Ms. Rugovac usually took two 5 to 8 minutes smoking breaks, one in the morning and one in the afternoon, in exchange, due to CHNY's harassment and scrutiny, she did not take a full 1-hour lunch away from her desk, like all the other employees did, but instead ate her lunch quickly at her desk.

60.     CHNY allowed the other smokers to take as many smoking breaks as needed, without keeping track of the number or length of the breaks and without disciplining or writing them up. Furthermore, other employees who took smoking breaks were also allowed to take a full hour for lunch and did not have to eat at their desks like Ms. Rugovac.

61.     On February 1, 2018, Carter emailed Mr. Miller, at what appears to be Reyes' request, sending him a Corrective Action Form and requesting that he use it to issue a verbal warning to Ms. Rugovac concerning her smoking breaks.

62.     In the email, Carter eagerly wrote: "This warning needs to be given to her tomorrow. . . . I started the document for you."

63.     On or about September 26, 2018, Carter again emailed Mr. Miller telling him "Yelena spends a lot of time on the phone and talking. . . . I would say of the 8 hours we pay her for working 2 – 3 hours is spent on the combined time for smoking breaks and talking on the phone."

64.     On the same day, Mr. Miller responded to Carter saying that he would speak to Ms. Rugovac but that "honestly, there is no way it is even close to that much. She is at her desk most

of the day . . . She gets her lunch [and] eats at her desk. She's rarely away from her desk for more than 10 minutes and when she's at her desk she's working . . . ."

65.     Mr. Miller than asked Carter: "I am curious how you've come to this determination that it's 2-3 hours a day that she is on the phone or smoking/talking. That is an extraordinary amount of time per day," and told Carter that "[t]his is not possible without me noticing, and I do not notice that at all." Unsurprisingly, Carter did not respond to Mr. Miller's email.

66.     In further retaliation and attempt to get rid of Ms. Rugovac, she noticed that CHNY stopped providing cleaning services to Ms. Rugovac's office and bathroom.

67.     When the conditions became unsanitary, Ms. Rugovac complained to CHNY's Director of Facility & Security that her office and bathroom needs cleaning, but he refused to provide the services and said that with "[her] experience, it is easy for [her] to clean the office and the bathroom]," referring to Ms. Rugovac's first position with CHNY over 20 years ago when she worked as a House Keeper.

68.     When Ms. Rugovac complained to Reyes about the fact that only her office and bathroom were not getting cleaned, she told her that going forward Ms. Rugovac, not the cleaning staff, was responsible for keeping those areas clean.  No other staff were responsible for cleaning their own offices and restrooms.

69.     On or about Thursday, October 18, 2018, Reyes, Carter and Charles Vento, the Departments' Controller, met with Ms. Rugovac and without any explanation demoted her from Grant Manager to an Accountant, a position which Ms. Rugovac held over 18 years ago.

70.     The only explanation provided to Ms. Rugovac was that CHNY has hired another Grant Manager who is starting work on Monday, October 22, 2018 and since allegedly CHNY couldn't have two Grant Managers, Ms. Rugovac had to be demoted to an Accountant.

-11-

71.     Upon information and belief, CHNY replaced Ms. Rugovac's position of Grant Manager with a younger employee, approximately of 30 years old, who did not have a disability and had not taken FMLA leave.

72.     Ms. Rugovac suffered a panic attack as a result of this retaliatory demotion and had to leave work to go to the doctor.

73.     As the result of this blatant retaliation and discrimination because of age and disability, Ms. Rugovac's health took turn for the worse and she had to take an FMLA leave from October 19, 2019 to November 13, 2018.

74.     On or about November 13, 2018, upon return from disability leave, Ms. Rugovac fearing further deterioration of her health and repetition of the panic attack stemming from CHNY and Reyes' discrimination and humiliation of her, she resigned from her Accountant position at CHNY.

75.     Ms. Rugovac was effectively constructively discharged as CHNY created a work atmosphere that is so intolerable due to age and disability discrimination that she was forced to quit and any reasonable person in her situation would equally feel compelled to quit.

76.     CHNY's torturous and discriminatory treatment of Ms. Rugovac was due to her age and disabilities, which manifested in numerous baseless accusations, retaliatory actions and wrongful termination of Ms. Rugovac, all causing her to greatly suffer mentally, emotionally and physically.

77.     Ms. Rugovac was not the only employee CHNY discriminated against based on their age. From approximately August 2018 to November 2018, CHNY terminated or constructively discharged at least 6 employees all over the age of 40 years old, including, but not limited to, Ms. Rugovac, Gary Livingstone, Director of Health Department, Anthony Sabia,

Associate Executive Director, Nunziato Cuzzupoli, Director of Facilities, Eric Gross, Grant Writer, Mr. Miller, Director of Grants and Purchasing, all of whom were between the ages of 50 and 66 years old.

78.     Upon information and belief, most, if not all, of these employees were replaced by much younger employees some of which were under the age of 40.

79.     Due to CHNY's inhumane and discriminatory treatment of her, Ms. Rugovac lost her health and was prescribed and has been taking, to date, a myriad of medications, including but not limited to Alprazolam, Nortriptyline, Levetiracetam and Tramadol.

80.     Furthermore, Ms. Rugovac continues to suffer the long-lasting effects of going deaf, developing seizures, severe depression and emotional distress from the stress caused by CHNY's harassment of her.

81.     CHNY discriminated against Ms. Rugovac based on her disabilities, including but not limited to seizures, deafness and depression, and wrongfully terminated her, taking away not only her livelihood but also her insurance and benefits at a very vulnerable time in her life.

82.     CHNY failed to engage in any type of reasonable accommodation process, instead made up a pretext reason to continually harass and torture Ms. Rugovac at work.

83.     CHNY was or should have been aware of its obligations under the law, including the obligation to engage in an "interactive process" aimed at designing a reasonable accommodation for her disabilities.

84.     CHNY's actions caused Ms. Rugovac severe emotional distress, including anxiety, depression and serious health problems.

85.     CHNY unlawfully discriminated against Ms. Rugovac and treated her differently because of her disabilities.

-13-

FIRST CAUSE OF ACTION
VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

86.     Ms. Rugovac repeats every preceding allegation as if fully set forth herein.

87.     This cause of action is brought under the ADA, 42 U.S.C. § 12101, *et seq*. and reference is made to the ADA in its entirety, and to 42 U.S.C. §§ 12102, 12112, 12117 and to 42 U.S.C. § 2000e-5.

88.     The ADA prohibits "discrimina[tion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment." 42 U.S.C. §§ 12112(a).

89.     At all relevant times, Ms. Rugovac was an "employee" and "person" under the ADA.

90.     At all relevant times, CHNY was and is an "employer" and "covered entity" under the ADA.

91.     Under the ADA, the term disability means, with respect to an individual: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

92.     Ms. Rugovac's seizures, deafness, depression, and related complications constitute disabilities under the ADA inasmuch as they substantially limit major life activities, like hearing.

93.     At all relevant times, Ms. Rugovac was a "qualified individual" with a disability within the meaning of the ADA because, among other items: (1) she had a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2)

-14-

she had a record of such an impairment; and/or (3) she was being regarded as having such an impairment. *See e.g.* 42 U.S.C. § 12102.

94.     CHNY failed to engage in a good faith interactive process with Ms. Rugovac, violating the ADA to accommodate her disabilities, but instead it retaliated and discriminated against her because of the disabilities.

95.     At all relevant times, Ms. Rugovac could and did perform all the essential functions of her job.

96.     CHNY's conduct, as alleged herein, constitutes unlawful employment practices, unlawful discrimination on the basis of a disability, and unlawful retaliation, violating the ADA.

97.     CHNY's unlawful conduct was intentional and was carried out with malice or reckless indifference to Ms. Rugovac's protected rights to be free from unlawful discrimination and retaliation.

98.     As a result of CHNY's unlawful conduct, Ms. Rugovac has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation, lost wages, lost benefits, pension monies and contributions, medical expenses, lost interest and attorneys' fees and costs. Ms. Rugovac is entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from CHNY under the ADA.

99.     As a further result of CHNY's unlawful conduct, Ms. Rugovac has suffered and continues to suffer, among other items, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Ms. Rugovac is entitled to recover damages for such injuries from CHNY under the ADA.

SECOND CAUSE OF ACTION
DISABILITY DISCRIMINATION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

100.    Ms. Rugovac repeats every preceding allegation as if fully set forth herein.

101.    At all relevant times, Ms. Rugovac was an "employee" and "person" under the NYSHRL.

102.    At all relevant times, CHNY was an "employer" under the NYSHRL.

103.    Ms. Rugovac's seizures, deafness and depression, and the complications and limitations, including but not limited to, problems with major life activities of hearing, arising from these conditions constitute disabilities under the NYSHRL, N.Y. Exec. Law §§ 292(21)(a)-(c).

104.    At all relevant times, Ms. Rugovac could and did perform the essential functions of her job.

105.    CHNY was on notice of her disabilities and failed to engage in good faith interactive process or to provide any reasonable accommodation, but instead discriminated and retaliated against her by terminating her employment.

106.    For failing to provide a reasonable accommodation to Ms. Rugovac's known disabilities; for failing to engage in a good faith interactive process, and for terminating her employment in retaliation, CHNY violated the NYSHRL. N.Y. Exec. Law §§ 296(1)(a) and 296(3)(a).

107.    By terminating Ms. Rugovac, CHNY violated the NYSHRL.

108.    As a result of CHNY's failure to engage into the interactive process and accommodate her disability, and because of its blatant and pervasive discrimination because of her disabilities, Ms. Rugovac has suffered and continues to suffer, inter alia, loss of wages, lost benefits, pension monies and contributions, medical expenses, lost interest, emotional distress,

mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

THIRD CAUSE OF ACTION
DISABILITY DISCRIMINATION
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

109.    Ms. Rugovac repeats every preceding allegation as if fully set forth herein.

110.    At all relevant times, Ms. Rugovac was an "employee" and "person" under the NYCHRL.

111.    At all relevant times, CHNY was an "employer" under the NYCHRL.

112.    Ms. Rugovac's seizures, deafness and depression, and the complications and limitations, including but not limited to, problems with major life activities of hearing, arising from these conditions constitute disabilities under the NYCHRL, N.Y.C. Admin. Code § 8-102(16)(a).

113.    Instead of accommodating her disabilities and engaging in interactive process, CHNY retaliated against Ms. Rugovac leading her to suffer emotional distress, and ultimately terminated her employment, further violating the NYCHRL.

114.    In failing to provide a reasonable accommodation to Ms. Rugovac's known disabilities, for failing to engage in a good faith interactive process and for discriminating and retaliating against her, CHNY violated the NYCHRL. N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(15)(a).

115.    By terminating Ms. Rugovac, CHNY violated the NYCHRL.

116.    As a result of CHNY's failure to engage in a good faith interactive process and to accommodate her disabilities, and because of its blatant and pervasive discrimination because of her disabilities, and Ms. Rugovac has suffered and continues to suffer, *inter alia*, loss of wages, lost benefits, pension monies and contributions, medical expenses, lost interest, emotional distress,

-17-

mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

FOURTH CAUSE OF ACTION
AGE DISCRIMINATION
UNDER AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (ADEA)

117.    Ms. Rugovac repeats every preceding allegation as if fully set forth herein.

118.    Ms. Rugovac's date of birth is 80/30/1962, and at all relevant times, she was approximately 56 years old.

119.    By the actions described in this complaint, the CHNY discriminated against Ms. Rugovac on the basis of her age in violation of the Age Discrimination in Employment Act 29 U.S.C. § 623(1) (ADEA) by denying her, based on her age, the same terms and conditions of employment available to other employees, including, but not limited to, harassing her; inquiring her when she would retire and suggesting that it was time for her to retire; threatening to terminate her at any time; wrongfully terminating her; and subjecting her to a hostile work environment.

120.    Ms. Rugovac was subjected to disparate treatment and adverse employment actions by CHNY in whole or substantial part because of her age, in violation of the ADEA—treatment and adverse employment actions to which no other employees were subjected .

121.    As a direct and proximate result of the CHNY's unlawful and discriminatory conduct in violation of the ADEA, Ms. Rugovac has suffered and continues to suffer harm for which she is entitled to an award of damages, including but not limited to actual damages, compensatory damages, liquidated damages, and attorneys' fees.

122.    The CHNY's violation of the ADEA was willful and Ms. Rugovac is entitled to liquidated damages.

## FIFTH CAUSE OF ACTION
## FMLA DISCRIMINATION & INTERFERENCE

123.    Ms. Rugovac repeats every preceding allegation as if fully set forth herein.

124.    CHNY was an employer within the meaning of the FMLA, 29 U.S.C. §§ 2601, et seq., with 50 or more employees within a 75-mile radius.

125.    Ms. Rugovac was eligible for job protected leave because she had worked for Defendants for more than 12 months and more than 1,250 hours.

126.    Ms. Rugovac suffered from a serious health condition.

127.    CHNY violated the FMLA by interfering with her FMLA leave, including, but not limited to, impermissibly contacting her while on leave and repeatedly retaliating against her for having taken protected leave. Such repeated retaliation had such a chilling effect on Ms. Rugovac that CHNY interfered with her right to take unpaid leave.

128.    CHNY further willfully discriminated against Ms. Rugovac by terminating her employment because she had taken FMLA leave and/or attempted to assert her rights to take FMLA leave.

129.    Due to CHNY's willful violations of the FMLA, Ms. Rugovac is entitled back pay, front pay, lost benefits, each with pre- and post-judgment interest, plus liquidated damages, costs and attorney's fees.

Dated: New York, New York.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Rugovac respectfully requests this Court grant the following relief:

a.    Accepts jurisdiction over this matter;

b.    Impanels and charges a jury with respect to the causes of action;

c.      Back pay, front pay and all benefits along with pre and post judgment interest in the amount of at least $150,000.00;

d.      Punitive, liquidated and compensatory damages including, but not limited to, damages for pain and suffering, anxiety, humiliation, loss of enjoyment of life, emotional distress in order to compensate her for the injuries she has suffered and to signal to other employers that discrimination is repulsive to legislative enactments in the amount of at least $500,000.00.

e.      An award of pre-judgment and post-judgment interest;

f.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

g.      Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Ms. Rugovac demands a trial by jury on all questions of fact the Complaint raises.

February 3, 2020

LIPSKY LOWE LLP

<u>s/ Christopher H. Lowe</u>
Christopher H. Lowe
Milana Dostanitch
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
Tel: 212.392.4772
Fax: 212.444.1030
chris@lipskylowe.com
milana@lipskylowe.com